IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

HATTIE MAE JOHNSON,
      Plaintiff,

vs.                                 Case No.: 3:14cv301/EMT

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,
      Defendant.
_____/

## MEMORANDUM DECISION AND ORDER

      This case has been referred to the undersigned magistrate judge for disposition pursuant to the authority of 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, based on the parties' consent to magistrate judge jurisdiction (*see* docs. 4, 5). It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act"), for review of a final decision of the Acting Commissioner of the Social Security Administration ("the Commissioner") denying Plaintiff's application for supplemental security income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381–83.

      Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence and comport with proper legal principles. Thus, the decision of the Commissioner is affirmed.

## I.    PROCEDURAL HISTORY

      On April 4, 2011, Plaintiff filed an application for SSI in which she alleged disability beginning March 6, 2010 (tr. 84).[1] Her application was denied initially and on reconsideration. Thereafter, Plaintiff requested a hearing before an administrative law judge ("ALJ"), who held a

---

[1] All references to "tr." refer to the transcript of Social Security Administration record filed on August 29, 2014 (doc. 7). Moreover, the page numbers refer to those found on the lower right-hand corner of each page of the transcript, as opposed to those assigned by the court's electronic docketing system or any other page numbers that may appear.

hearing on October 18, 2012, at which Plaintiff—who was represented by counsel—and a vocational expert ("VE") testified. On January 18, 2013, the ALJ issued a decision in which she found Plaintiff "not disabled," as defined under the Act, at any time through the date of her decision (tr. 20–28). The Appeals Council subsequently denied Plaintiff's request for review. Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court. Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007). This appeal followed.

II.    FINDINGS OF THE ALJ

In her January 18, 2013, decision denying Plaintiff's claim, the ALJ made the following findings (see tr. 20–28):

(a)    Plaintiff has not engaged in substantial gainful activity since April 4, 2011, the date of her SSI application[2];

(b)    Plaintiff has the following severe impairments: epilepsy and anemia;

(c)    Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1;

(d)    Plaintiff has the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 416.967(b), except Plaintiff is able to lift and carry ten pounds frequently and twenty pounds occasionally; sit, stand, and walk for a total of six hours each during an eight-hour workday; frequently use the upper and lower extremities to push and pull; occasionally balance and climb ramps and stairs; and frequently stoop, kneel, crouch, and crawl. She is able to frequently reach overhead and continuously handle, finger, and feel. Plaintiff is precluded from climbing ladders, ropes and scaffolds and from exposure to extreme heat and cold. Plaintiff requires seizure precautions, which include no work around unprotected heights, dangerous machinery, open flames, or large bodies of water and no operation of motor vehicles;

(e)    Plaintiff is unable to perform her past relevant work as a fast food worker and stock clerk;

---

[2]  The time frame relevant to Plaintiff's claim for SSI is April 4, 2011 (the date of her application for SSI) through January 18, 2013 (the date of the ALJ's decision). See Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005) (indicating that SSI claimant becomes eligible to receive benefits in the first month in which she is both disabled and has an SSI application on file).

(f)     Plaintiff was born on October 23, 1988.  Thus, on April 4, 2011, she was twenty-two years of age, which is defined as a younger individual age 18–49;

(g)     Plaintiff has at least a high school education and is able to communicate in English;

(h)     Plaintiff has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy, including cashier, information clerk, and counter clerk;

(i)     Plaintiff has not been under a disability, as defined in the Act, since April 4, 2011, the date her SSI application was filed;

## III.    STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998); Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439.  The court may not decide the facts anew, reweigh the  evidence, or substitute its judgment for that of the Commissioner. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the evidence

preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence.  Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  Id. § 423(d)(2)(A).  Pursuant to 20 C.F.R. § 404.1520(a)–(g),[3] the Commissioner analyzes a disability claim in five steps:

1.      If the claimant is performing substantial gainful activity, she is not disabled.

2.      If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3.      If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5.      Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her RFC and vocational factors, she is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work.  20 C.F.R. § 404.1512.  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must

---

[3] In general, the legal standards applied are the same regardless of whether a claimant seeks disability insurance benefits ("DIB") or SSI, but separate, parallel statutes and regulations exist for DIB and SSI claims (see 20 C.F.R. §§ 404, 416).  Therefore, citations in this Order should be considered to refer to the appropriate parallel provision.  The same applies to citations of statutes or regulations found in quoted court decisions.

then prove she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.    MEDICAL EVIDENCE[4] AND HEARING TESTIMONY

    A.    Medical Evidence

Plaintiff was seen at the Sacred Heart Hospital Emergency Room in November 2008 after having possibly experienced a seizure while driving and being stopped by law enforcement for running a red light (tr. 371).  Plaintiff reported that she had a history of seizures, although she had not suffered one in a long time, and that she had been compliant with her anti-seizure medication, Keppra (tr. 368, 371).

On March 13, 2010, Plaintiff presented at the Escambia Community Clinic to, as she put it, "get tested for epilepsy" (tr. 402).  Plaintiff reported that she had recently been found on the floor at work, unconscious (*id.*).  Plaintiff stated that she had a history of having seizures, for which she was prescribed Keppra, and that she had last taken Keppra in September 2009 (*id.*).  The assessment was epilepsy, with simple seizure, intractable (*id.*).  On March 17, 2010, Plaintiff presented to the Baptist Health Care Emergency Room, with the chief complaint of having seizures off and on all week (tr. 414).  No biting of the tongue, urinary or stool incontinence, or injury was reported (tr. 415).  Plaintiff reported having missed taking her anti-seizure medication for the past six months; she refused for several hours to take the ant-seizure medication Dilantin that she was offered but eventually did so (tr. 413, 415).  The impression was seizure, with medical non-compliance (tr. 415).  Plaintiff was advised to see her physician (tr. 416).  Plaintiff returned to the Baptist Hospital

---

[4] With respect to the medical evidence, the court has largely relied on the parties' memoranda for the references to the record that pertain to Plaintiff's claim (*see* docs. 9, 10), in particular Plaintiff's memorandum because she bears the burden of demonstrating the Commissioner's decision to deny benefits was incorrect.  The court has augmented the parties' references to the record and factual information, sometimes substantially, where deemed appropriate for clarity and completeness, although it has not outlined the entire record.

    The court's September 2, 2014, Scheduling Order in part requires the parties to file memoranda in support of their respective positions which specifically cite the record by page number for all factual contentions (doc. 8).  The Scheduling Order cautions that the failure to do so "will result in the contention(s) being disregarded for lack of proper development" (*id.* at 2).  Accordingly, if a party simply cites groups of pages (*see, e.g.,* Plaintiff's memorandum at p. 7, citing "*generally*" groups of pages from eight to twenty-six pages in length each, for a total of seventy-eight pages), the court has considered the general factual proposition presented (i.e., "Plaintiff was diagnosed with seizure disorder and/or epilepsy . . . at the Escambia Community Clinic . . . [and was treated by] Ruth Henchey, M.D., and Patricia Myers, M.D.").  The court has not, however, considered the detailed factual information contained in each of those pages, unless  those pages have been properly cited elsewhere in the memorandum.

Emergency Room in May 2010, again reporting having suffered a seizure; it was noted that Plaintiff had not taken her anti-seizure medication for the prior five months (tr. 425).  At the time of her examination, Plaintiff was described as being alert and oriented, times three (*id.*).

On August 30, 2010, an SSA consulting physician completed a physical RFC assessment for Plaintiff (tr. 435–42).  The consultant concluded that Plaintiff could occasionally lift fifty pounds and frequently lift twenty-five pounds; could stand and/or walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; occasionally climb ramps and stairs but never climb ladders, ropes or scaffolds; occasionally balance; and frequently stoop, kneel, crouch, and crawl.  *Id.*  She had no manipulative, visual, communicative, or environmental limitations, other than that she must avoid even moderate exposure to hazards due to seizures.

In March, April, May, July, and September 2010, Plaintiff was seen at the Escambia Community Clinic, including for seizure evaluation and Keppra prescriptions; the initial Keppra dose of 500 mg, twice daily, was increased to 1000 mg, twice daily, as of September 2010 (tr. 461–62, 463–64, 467–68, 469–70).  Plaintiff was also seen at St. Joseph's Medical Screening Facility between January 25, 2011, and April 6, 2011, for seizure evaluation and to obtain Keppra, the dose for which was 500 mg, twice daily (tr. 474–77).

Neurologist Ruth Henchey, M.D., first examined Plaintiff on April 27, 2011 (tr. 498).  Dr. Henchey reported that Plaintiff's most recent seizure had occurred the prior month [March 2011], she had begun experiencing seizures at age sixteen, she had a family history of seizures, her longest seizure-free interval was approximately one year, and she averaged about two seizures per year (*id.*).  Dr. Henchey also noted that Plaintiff "has had Keppra 500 mg one tablet [by mouth] twice daily but is still having seizures" (*id.*).  Plaintiff remained active, however, indicating that she was able to exercise by running and performing yoga (*id.*).  Dr. Henchey increased Plaintiff's dose of Keppra to 1000 mg, twice daily, and ordered an electroencephalogram ("EEG").  A lab report dated April 27, 2011, which Dr. Henchey referenced in a May 2, 2011, letter to Plaintiff, notes a Keppra level of 15.5 mcg/mL, which the test report indicates is a level within the anticipated therapeutic range of 3.1 mcg/mL to 25 mcg/mL for a patient taking one 500 mg tablet of Keppra twice daily (tr. 503,

505).[5]  In her letter, Dr. Henchey reminded Plaintiff that since the blood serum test had been taken her dose had been increased to 1000 mg of Keppra, twice daily (tr. 505).

Plaintiff underwent another Keppra level blood serum test on May 25, 2011, the day before she returned to see Dr. Henchey for a follow-up visit (tr. 502).  This result showed a level of 11.0 mcg/mL of Keppra, which was within the anticipated therapeutic range of 4.9 mcg/mL to 40.0 mcg/mL for a patient taking 1000 mg, twice daily (*id.*).  At the May 26, 2011, visit, however, Dr. Henchey noted Plaintiff's report that she was not taking Keppra twice daily as prescribed but instead was taking 1000 mg of Keppra in the morning only, or one-half the prescribed dose (tr. 495).  Dr. Henchey noted that Plaintiff talked continually, making communication with her difficult.  Among other information she relayed, Plaintiff apparently told Dr. Henchey that she believed her epilepsy was related to her being in motor vehicle accident as a teenager and that she was applying for Social Security disability benefits (*id.*).  Also, Plaintiff reported that she had experienced headaches, nausea, and fatigue whether on or off Keppra and that she believed the medication was "'addicting' and that is why the symptoms persisted when she stopped the medication in the past (?)" (*id.*).  Dr. Henchey noted that Plaintiff reported no new or worsening problems since her last visit (tr. 496).  Her assessment was that Plaintiff was "asymptomatic on Keppra although she is taking her twice daily medication only once daily.  She has little insight [in]to her diagnosis/treatment." (*id.*).  Dr. Henchey again prescribed the use of 1000 mg of Keppra, twice daily and noted that she would check Plaintiff's lab work again once she was compliant with the regimen of taking 1000 mg of Keppra twice daily (*id.*).

Plaintiff underwent magnetic resonance imaging ("MRI") of the brain on June 15, 2011, which rendered a normal result (tr. 507).  On June 28, 2011, Dr. Henchey informed Plaintiff by letter that an EEG conducted that date was "abnormal and consistent with epilepsy" (tr. 504; *see also* tr. 508).  She advised Plaintiff that she should not drive and should remain on her anti-seizure medication (*id.*).

---

[5]  The test report references a "trough" range and a "peak" range of therapeutic Keppra levels (tr. 503). Generally speaking, "[t]he trough level is the lowest concentration in the patient's bloodstream; therefore, the specimen should be collected just prior to administration of the drug.  The peak level is the highest concentration of a drug in the patient's bloodstream."  *See* http://www.nhrmc.org/therapeuticdrugs-optimaltimetodrawsamples (last visited June 15, 2015).

Plaintiff presented to the Baptist Hospital Emergency Room on August 4, 2011, with a chief complaint of seizure activity (tr. 563).  Plaintiff reportedly had not experienced tongue biting, incontinence, or injury and was taking 500 mg of Keppra three times daily (tr. 568); it was noted that Plaintiff was taking only half her prescribed dose (*id.*).  At the time she was examined, she was alert and oriented, times three (tr. 566).  On August 5, 2011, Dr. Henchey again examined Plaintiff, who reported having suffered three seizures in one week, the most recent one being the day prior (tr. 542).  Dr. Henchey, who noted that Plaintiff's Keppra dose was 1500 mg twice daily (*id.*), stated that Plaintiff suffered from "intractable epilepsy due to nonadherence to medication; probable primary generalized epilepsy with generalized tonic clonic convulsive motor seizures" (tr. 543).  Plaintiff was advised to take 1500 mg of Keppra, twice daily, and to obtain a Keppra level blood serum test (*id.*).  In the report of a return visit on August 23, 2011, Dr. Henchey noted that Plaintiff had suffered no further seizures since taking Keppra as prescribed, although she was slightly dizzy and sleepy since increasing the dose (tr. 539).  Dr. Henchey's impression was that Plaintiff's "seizure control is improved on prescribed dosage of seizure medication; adherence improved" (tr. 540).  There is no mention of a Keppra level blood serum test report.

Plaintiff underwent an ambulatory EEG on September 14 through September 15, 2011, the report of which described findings that were "improved" compared with the previous EEG [of June 28, 2011] and activity consistent with localization-related epilepsy (tr. 546).  During a September 27, 2011, visit to Dr. Henchey, Plaintiff and her mother reported that Plaintiff had recently experienced a brief seizure (tr. 536).  Even so, Plaintiff's mother thought that Plaintiff was substantially improved and that her seizure condition was under better control (*id.*).  Dr. Henchey's impression was "improved seizure control on Keppra although not entirely seizure-free; seizure type initially thought primary generalized but more recent EEG suggesting possible localization related partial onset with second generalization" (tr. 537).  Dr. Henchey increased Plaintiff's Keppra to 1750 mg twice daily and recommended several tests, including a Keppra level blood serum test and a repeat ambulatory EEG (*id.*).  The ambulatory EEG was performed on September 28 through September 30, 2011, and indicated findings consistent with underlying localization-related epilepsy (tr. 545).  There was no evidence of subclinical EEG seizures in the absence of reported clinical seizures during the recording (*id.*).

Plaintiff arrived at the Baptist Hospital Emergency Room on December 12, 2011, via ambulance, with the chief complaint of seizures one hour previously while at church (tr. 547). She was described at that time as being alert and oriented, times three, with no report of incontinence or tongue biting during the event (tr. 550). Dr. Henchey noted the visit at Plaintiff's December 15, 2011, appointment, reporting that Plaintiff had experienced what Plaintiff's mother described as a grand mal type seizure as well as a "'small seizure'" (tr. 533). No fever, sleep deprivation, or missed medication doses were reported (*id.*). Plaintiff described stress as being a major factor and precipitating cause of her seizures (*id.*). Dr. Henchey also noted that Plaintiff's mother was briefly verbally belligerent during the visit and objected to the use of medication due to a concern about side effects, stating a belief that "having a couple of seizures is not too bad" (*id.*). Ultimately, Plaintiff and her mother indicated they were satisfied with the treatment Dr. Henchey was providing (*id.*). Noting her impressions of Plaintiff's condition, Dr. Henchey reported "breakthrough seizure activity [ ] despite adequate dosage and level generic Keppra" and "possible [ ] 'stress-related' seizures" (tr. 535). Dr. Henchey decided to consider non-epileptic seizures in the differential diagnosis, and she referred Plaintiff to neurologist Patricia Myers, M.D., at the epilepsy monitoring unit at Sacred Heart Hospital for evaluation (*id.*).

Dr. Myers examined Plaintiff on January 10, 2012 (tr. 578), with no "records for review today" (tr. 579). Dr. Myers noted that, based on Plaintiff's self-reported history, Plaintiff appeared to be experiencing approximately one convulsive event per month, with "smaller events" (evidently, those involving staring into space, drooling, and not responding for about five minutes, as well as those involving making a loud noise and clutching her chest) occurring randomly (tr. 578). Dr. Myers stated that it was difficult to ascertain Plaintiff's seizure frequency because she and her mother, who accompanied Plaintiff to the appointment, were poor historians. Plaintiff indicated that stress was a trigger for her seizures, and her mother noted that when they got into an argument Plaintiff was more likely to have an event (*id.*). Dr. Myers noted Plaintiff's last reported seizure was in December 2011, as well as Plaintiff's comments that she thought she had missed one or two doses of Keppra at that time and that she thought her breakthrough seizures were related to not taking her medication (*id.*). Dr. Myers' assessment was "history of spells concerning for seizures" (tr. 579). Dr. Myers also mentioned Plaintiff's report that she had been noncompliant with her current Keppra

dose, which seemed to be the trigger for some episodes.  For that reason, Dr. Myers did not wish to start a second anti-epileptic medication at that time; rather, she preferred to see how Plaintiff did when she took her medication as prescribed (*id.*).  If Plaintiff continued to have breakthrough spells on her current dose of Keppra, a second anti-seizure medication likely would be required (tr. 580).

Dr. Henchey examined Plaintiff again on January 19, 2012, when Plaintiff reported that she had not suffered any seizures since her last visit in December 2011; she was currently prescribed 1750 mg of Keppra, twice daily (tr. 530).  Plaintiff was exercising and sleeping well (*id.*).  Dr. Henchey's clinical impression was that Plaintiff was "seizure free and feeling well on current seizure medication; probable epilepsy with less likely component nonepileptic seizures" (tr. 531).  Dr. Myers saw Plaintiff again for follow-up in February 2012 (tr. 575).  Plaintiff reported no further events, so Dr. Myers decided to maintain the current dose of Keppra and to consider conducting a video EEG if Plaintiff's spells continued (*id.*).  Records from St. Joseph dated February 2012 also note no recent seizure activity while Plaintiff was on her anti-seizure medication (tr. 516).

At an April 2012 visit with Dr. Henchey, it was noted that Plaintiff's most recent seizure had occurred in December 2011 (tr. 527).  Dr. Henchey noted that Plaintiff had been evaluated by Dr. Myers but did not require epilepsy monitoring or further testing because she had been "seizure free adherent to her seizure medication now" (*id.*).  Plaintiff reported that she was not working or going to school at that time, but she was singing in a choir and hoping to perform volunteer work (*id.*).  Dr. Henchey continued Plaintiff on 1750 mg of Keppra, twice daily (*id.*).  Dr. Henchey noted that if Plaintiff remained medication adherent and seizure-free until July 2012, Plaintiff could pursue having her driving privileges reinstated (*id.*).

Plaintiff returned to see Dr. Myers in July 2012, when it was noted that Plaintiff was doing well and no change would be made to her medication regimen (tr. 573).  Dr. Myers told Plaintiff she would be happy to prepare the Department of Motor Vehicles paperwork needed for Plaintiff to resume driving (*id.*).

Plaintiff presented to the Baptist Hospital Emergency Room, via ambulance, on August 21, 2012 (tr. 586), with a chief complaint of "'seizure' PTA [post traumatic amnesia]" (tr. 591).  According to Plaintiff, she had been exercising in a group session at a community center when the seizure occurred (tr. 50).  At the hospital, Plaintiff was found to be alert and oriented, times three,

with no neurological deficits noted in triage (*id.*). A pregnancy test was negative (tr. 593), as was a urine toxicology screen (tr. 594). A complete blood count with differential and metabolic panel showed mostly normal or near-normal results (tr. 595, 596). Plaintiff had not bitten her tongue, been incontinent, or been injured during the event (tr. 592). The clinical impression was seizure, generalized, and Plaintiff was discharged in stable condition (*id.*). Plaintiff also presented to the Baptist Hospital Emergency Room on September 28, 2012, with a chief complaint of left finger pain (tr. 601), which was diagnosed as a sprain (tr. 606).

Dr. Myers saw Plaintiff again on October 15, 2012, at which time Plaintiff reported that she had been experiencing nighttime seizures at least once per week for the previous several months (tr. 612). Dr. Myers reminded Plaintiff that in July 2012 she had reported having no seizures. Plaintiff responded that she was having seizures at that time but "was not sure so she did not mention it" (*id.*). Plaintiff reported sometimes awakening on the floor with her pillow and bed sheets in disarray and also having "staring spells" during the day. Dr. Myers noted that Plaintiff was a "very poor historian so it is hard to get an accurate description of what happens" (*id.*). Plaintiff stated that she continued to take Keppra. Dr. Myers recommended that a video EEG be performed, noting she was "not certain that these events represent epileptic seizures" (*id.*). Accordingly, before Dr. Myers added a second anti-epileptic medication she wanted to confirm the nature of Plaintiff's spells (*id.*).

Also in October 2012, Dr. Myers completed a "Seizures Medical Source Statement" for Plaintiff (tr. 582–85). Dr. Myers noted that she had first seen Plaintiff on January 10, 2012, and had seen her three more times since then (tr. 582). In this form, when asked if Plaintiff suffered seizures, rather than stating "yes" or "no" Dr. Myers stated that Plaintiff had "spells concerning for seizures" (*id.*). She noted that work-up was being performed at that time to establish the seizure type. Dr. Myers indicated that the average frequency of Plaintiff's seizures was one per week and occurred at night (*id.*). Dr. Myers described a typical seizure as "convulsive episodes occurring at night" (*id.*). Symptoms associated with the seizure disorder were tongue bites or other injuries and loss of bladder control (tr. 583). Following a seizure, Plaintiff experienced confusion and exhaustion which lasted for approximately thirty minutes, and she needed "complete rest for one entire day following seizure" (*id.*). Dr. Myers wrote "N/A" with respect to positive test results. Dr. Myers stated that

stress and exertion could precipitate Plaintiff's having a seizure; Plaintiff was, however, capable of performing low stress work (*id.*).  With respect to the type of medication Plaintiff took and her response to it, Dr. Myers noted "Keppra—continues to have seizures" (*id.*).  According to Dr. Myers, Plaintiff was compliant with her medication.  A side effect of Plaintiff's use of Keppra was lethargy.  Dr. Myers opined that Plaintiff could sit and stand/walk four hours in an eight-hour day and was limited to lifting ten pounds occasionally and twenty pounds rarely.  She also opined that Plaintiff likely would require unscheduled breaks during a workday approximately once every three months for doctors' appointments and that her impairments were likely to produce "good days" and "bad days" (*id.*).  If Plaintiff were able to work full time, she would likely be absent from work three days per month as a result of her impairment or treatment (*id.*).

B.     Hearing Testimony

1.     <u>Plaintiff's Testimony</u>

Plaintiff testified at the October 18, 2012, administrative hearing that she was presently attending college, where she took four classes and was working on obtaining a legal assistant's degree (tr. 41–42).  According to Plaintiff, she was unable to work because, if she was under stress, she would have seizures (tr. 43).  The last time she had worked, in 2010, she had been found unconscious under a table by her co-workers (*id.*).  When the ALJ asked Plaintiff about her medication compliance, Plaintiff responded that she had forgotten only once to take her medication (tr. 44).  She had also been compliant with her anti-seizure medication at the time of her August 2012 emergency room visit (tr. 49), with a blood test showing that her Keppra level "was compliant with my daily dosage" (tr. 50).  Additionally, when Plaintiff told Dr. Myers, apparently in July 2012, that she was not experiencing seizures Plaintiff "didn't know at that point that I was having them at night time as well.  And when I wake, I will be more tired than usually I was being.  I didn't know that my seizures also occurred during those periods where I was asleep." (tr. 45; *see also* tr. 56).  She indicated that she spoke with Dr. Myers about getting her driver's license reinstated "if I didn't have any more seizures during the day time—because during that period—night time seizures, I didn't think that that was a problem" (tr. 46).  With respect to night time seizures, the residual effects—such as feeling tired, fatigued, overwhelmed, drowsy, and experiencing mood swings and having poor coordination—lasted approximately as long as two or possibly three days after the

seizure (tr. 56–57).  Plaintiff also reported that her medication sometimes caused her to be drowsy, dizzy, unable to sleep, irritable, and to suffer mood swings (tr. 55), and that she had difficulty with weakness (tr. 57).

### 2.    Vocational Expert's Testimony

After Plaintiff's past work as a stock clerk and fast food worker was identified, the ALJ asked the VE to assume an individual of Plaintiff's age, education, and vocational experience who could lift and carry ten pounds frequently and twenty pounds occasionally; sit, stand, and walk for a total of six hours each throughout the eight-hour work day; frequently use upper and lower extremities to push and pull; occasionally balance; occasionally climb ramps and stairs; frequently stoop, kneel, crouch, crawl; frequently reach overhead; and continuously handle, finger, and feel. Also, the individual could not be exposed to extreme heat or cold, and she required seizure precautions, which included being precluded from climbing ladders, ropes, and scaffolds; operating motor vehicles; and working around unprotected heights, dangerous machinery, large bodies of water, or open flames (tr. 60).  The VE opined that the hypothetical individual would be able to perform work as a cashier, an information clerk, and counter clerk (tr. 61)  Upon being questioned by Plaintiff's counsel, the VE testified that if the individual was unable to perform "high-stress" work[6] that could either cause a seizure or post-seizure residual problems, the individual would not be able to perform the jobs identified (tr. 63).

### V.    DISCUSSION

Plaintiff argues that the ALJ erred at step three of the sequential analysis by failing to find that her epilepsy condition meets or equals the requirements of Listing 11.00, specifically Listing 11.02 or Listing 11.03.  The Commissioner responds that substantial evidence supports the ALJ's finding that Plaintiff's impairment or combination of impairments did not meet or equal the Listings.

The Listings identify impairments which are considered severe enough to prevent a person from engaging in gainful activity.  20 C.F.R. § 416.925(a).  At step three, a claimant is conclusively presumed to be disabled if she meets or equals the level of severity of a listed impairment.  Crayton

---

[6] Plaintiff's counsel defined "high-stress" work as work that adversely impacted non-exertional functions such as paying attention to detail, dealing with co-workers and supervisors, and dealing with job duties and responsibilities (tr. 63).

v. Callahan, 120 F.3d 1217, 1219 (11th Cir. 1997); 20 C.F.R. §§ 416.920(a)(4)(iii),(d) & 416.926. To meet a Listing, the claimant must meet all of the specified medical criteria, and an impairment that fails to do so does not qualify no matter how severely it meets some of the criteria.  Sullivan v. Zebley, 493 U.S. 521, 530, 110 S. Ct. 885, 107 L. Ed. 2d 967 (1990).  To establish that a claimant "equals" a Listing, the medical findings must be "at least equal in severity and duration to the listed findings."  See id. § 416.926(a).  The claimant bears the "burden of proving that an impairment meets or equals a listed impairment."  Burt v. Barnhart, 151 F. App'x 817, 819 (11th Cir. 2005) (citing Barron v. Sullivan, 924 F.2d 227, 229 (11th Cir. 1991)).

In pertinent part, Listing 11.00, Neurological, provides:

A.    *Epilepsy*.  In epilepsy, regardless of etiology, degree of impairment will be determined according to type, frequency, duration, and sequelae of seizures. At least one detailed description of a typical seizure is required.  Such description includes the presence or absence of aura, tongue bites, sphincter control, injuries associated with the attack, and postictal phenomena. The reporting physician should indicate the extent to which description of seizures reflects his own observations and the source of ancillary information.  Testimony of persons other than the claimant is essential for description of type and frequency of seizures if professional observation is not available.

Under 11.02 and 11.03, the criteria can be applied only if the impairment persists despite the fact that the individual is following prescribed antiepileptic treatment.   Adherence to prescribed antiepileptic therapy can ordinarily be determined from objective clinical findings in the report of the physician currently providing treatment for epilepsy.  Determination of blood levels of phenytoin sodium or other antiepileptic drugs may serve to indicate whether the prescribed medication is being taken.  When seizures are occurring at the frequency stated in 11.02 or 11.03, evaluation of the severity of the impairment must include consideration of the serum drug levels.  Should serum drug levels appear therapeutically inadequate, consideration should be given as to whether this is caused by individual idiosyncrasy in absorption of metabolism of the drug.  Blood drug levels should be evaluated in conjunction with all the other evidence to determine the extent of compliance.  When the reported blood drug levels are low, therefore, the information obtained from the treating source should include the physician's statement as to why the levels are low and the results of any relevant diagnostic studies concerning the blood levels.  Where adequate seizure control is obtained only with unusually large doses, the possibility of impairment resulting from the side effects of this medication must be also assessed.  Where documentation shows that use of alcohol or drugs affects adherence to prescribed therapy or may play a part in the precipitation of seizures, this must also be considered in the overall assessment of impairment level.

> 11.02  *Epilepsy—convulsive epilepsy, (grand mal or psychomotor), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month in spite of at least 3 months of prescribed treatment.* With:

> A.    Daytime episodes (loss of consciousness and convulsive seizures) or

> B.    Nocturnal episodes manifesting residuals which interfere significantly with activity during the day.

> 11.03  *Epilepsy—nonconvulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment.* With alteration of awareness or loss of consciousness and transient postictal[7] manifestations of unconventional behavior or significant interference with activity during the day.

20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 11.02, 11.03.

Plaintiff challenges the ALJ's finding that her seizure disorder does not rise to the level of required severity to meet Listing 11.00 because, although the condition "is capable of being managed with properly administered conservative treatment, [it] has been complicated secondary to lack of compliance with prescribed antiepileptic medicines" (doc. 9 at 8, citing tr. 22). Plaintiff contends this finding is contrary to her testimony at the administrative hearing that she suffers weekly seizures at night and post-seizure effects, even though she takes Keppra (*id.*, citing tr. 56–58). Furthermore, Plaintiff submits, Dr. Henchey's April 27, 2011, treatment note (indicating that Plaintiff took Keppra "twice daily but is still having seizures") supports her hearing testimony (*id.* at 9, citing tr. 498), while the record evidence cited by the ALJ is limited in scope and outdated (*id.*, apparently citing tr. 25 and ALJ's references to Exhs. 4F, 5F, and 7F, dated March to October 2010). Moreover, according to Plaintiff, the ALJ's medication non-compliance finding contradicts Dr. Myers' medical records and her Seizure Medical Source Statement. Rather, Plaintiff maintains, Dr. Myers' opinions are supported by her medical records and are not merely conclusory.

---

[7]  A postictal state refers to the recovery period following a seizure.

Plaintiff does not explicitly dispute the ALJ's credibility finding or develop any argument that the treating physician's rule should apply to Dr. Myers' opinion, although her arguments implicate these issues.  Addressing them, the court finds no reversible error with respect to either.

To show a disability based on testimony of pain or other subjective symptoms, a claimant must satisfy two parts of a three-part test showing:  (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed [symptoms].  Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002) (per curiam).  A two-step analysis is used in considering a claimant's subjective complaints.  The ALJ must first determine whether there is an underlying medically determinable impairment that could reasonably be expected to cause the claimant's subjective symptoms; if the claimant establishes an impairment that could reasonably produce her symptoms, the ALJ must evaluates the intensity and persistence of the symptoms and their effect on the claimant's functioning.  20 C.F.R. §§ 416.929(a), (c)(1).  Although credibility determinations "are the province of the ALJ," Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005) (per curiam), if the ALJ discredits the claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so."  Wilson, 284 F.3d at 1225.  Evaluation of a claimant's subjective symptoms may include consideration of such factors as (1) the claimant's daily activities, (2) the nature and intensity of pain and other symptoms, (3) precipitating and aggravating factors, (4) effects of medications, and (5) treatment or measures taken by the claimant for relief of symptoms.  See 20 C.F.R. § 416.929(c)(3).

The ALJ cited the appropriate standard and outlined Plaintiff's medical records in considerable detail before concluding, in well-articulated findings, that Plaintiff's allegation that her seizure disorder prevented her from performing sustained work activity was not fully credible (tr. 23–25).  In generally discounting Plaintiff's credibility (tr. 26), the ALJ noted Plaintiff's testimony that she was currently enrolled in four college classes; had exercised regularly prior to injuring her finger; was able to perform various household chores; and could take public transportation.  As the ALJ concluded, Plaintiff's ability to perform such functions diminishes her credibility with respect to her contention that her seizure disorder completes precludes her ability to perform work (id.).

More particularly, the ALJ noted that "[a]lthough treatment notes document seizure related symptoms, it is clear throughout much of the evidentiary record that the claimant has repeatedly been noncompliant with her medication maintenance" and her "seizures are capable of being controlled with adherence to properly administered medication and medical management" (tr. 25). These statements are supported by the medical records, which the court has summarized above. While some of the records of Drs. Henchey and Myers reference Plaintiff's compliance with her Keppra dose (*see* tr. 498, 502, 505, 528, 531, 535, 537, 540, 575), there also are numerous instances when Plaintiff was described as or admitted to not being medication-compliant (*see* tr. 402, 415, 425, 495, 543, 568, 578, 579). Additionally, several times when Plaintiff reportedly was seizure-free or her seizures were under better control it was noted that her medication-adherence had improved (tr. 528, 531, 537, 540, 575), which supports a correlation between Plaintiff's compliance with the recommended dose of Keppra and control of her seizures.

Plaintiff also complains that the March to October 2010 records cited by the ALJ in support of her finding reflect only a limited period of time and are outdated. This contention requires little discussion. The ALJ's decision contains a fairly thorough, and adequately documented, review of the extensive medical record, including the records which reflect Plaintiff's non-compliance with her medication regimen. That the ALJ cited only three records in support of her statement that "it is clear throughout much of the evidentiary record that the claimant has repeatedly been noncompliant with her medication maintenance" is of no consequence. The ALJ was not required to cite every relevant document, either in her decision as a whole or in support of that specific sentence. *See* Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005) (indicating there is no rigid requirement that the ALJ specifically refer to every piece of evidence, so long as the decision provides enough reasoning to conclude she considered the claimant's medical condition as a whole).[8] Furthermore, the ALJ's larger discussion of the credibility issue is amply supported by numerous citations to the medical evidence. Additionally, the court notes that in August 2011 Dr.

---

[8] The court notes Plaintiff's complaint that the ALJ failed to address the results of the three EEGs ordered by Dr. Henchey. As just stated, the ALJ is not required to itemize and address every single piece of evidence in the record, provided the decision reflects sufficient reasoning to conclude the claimant's medical condition as a whole was considered. *See* Dyer, 395 F.3d at 1211. Such is the case here. As the ALJ adequately reviewed the records of Dr. Henchey, which reference and/or discuss the EEGs she ordered, the court is satisfied that the ALJ properly considered Plaintiff's medical condition as a whole.

Henchey stated that Plaintiff had not been medication-compliant before reporting improved compliance, and improved seizure control, later the same month (tr. 539, 543).  Also, in January 2012 Plaintiff admitted to Dr. Myers that she had been non-compliant with her medication in December 2011 and that her non-compliance was a likely cause of breakthrough seizures (tr. 578, 579).  Both references were made subsequent to the April 2011 reference on which Plaintiff relies. Likewise, Plaintiff fails to acknowledge Dr. Henchey's statement in May 2011 that, although asymptomatic at that time, Plaintiff was not taking her medication as prescribed (tr. 496), or that in August 2011 Plaintiff was again noted to have been non-adherent to her prescribed dose of Keppra (tr. 543).  Also, although Plaintiff testified at the hearing that a Keppra level blood serum test taken in August 2012 showed compliance, the court could not locate a record of any such test having been performed at that time (*see* tr. 586–600).  As to Plaintiff's contention that the ALJ should not have discounted her testimony that she suffers nocturnal seizures at least weekly, the court notes that in the clinical record for Plaintiff's October 2012 visit with Dr. Myers, when Plaintiff first reported having night time seizures, Dr. Myers reminded Plaintiff that as recently as July 2012 she had reported having no seizures at all (tr. 612).  Dr. Myers stated, however, that Plaintiff was a poor historian from whom it was difficult to obtain an accurate picture of events, and it is noteworthy that the *only* evidence of Plaintiff's suffering nocturnal seizures is her self-report.  Tellingly, at that time Dr. Myers questioned whether "these events represent epileptic seizures" and thus recommended further testing before deciding to add another anti-epileptic medication to Plaintiff's regimen (*id.*). For all of the foregoing reasons, the court concludes that the ALJ did not err in discounting Plaintiff's credibility.

The court turns next to the ALJ's consideration of Dr. Myers' records and opinion.  Under what is known as the "treating physician's rule," substantial weight must be given to the opinion, diagnosis, and medical evidence of a treating physician unless there is good cause to do otherwise. *See* Lewis v. Callahan, 125 F.3d 1436, 1439–41 (11th Cir. 1997); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991);  Sabo v. Chater,  955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d).  "'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  Phillips v. Barnhart, 357 F.3d 1232, 1240–41 (11th Cir. 2004) (citation omitted).  The ALJ may discount a treating physician's

opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  *See* Edwards, 937 F.2d 580 (finding that the ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well supported by medically acceptable clinical and laboratory diagnostic techniques, however, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527(c)(2).  The ALJ is required to consider all of the evidence in the claimant's record when making a disability determination, *see* 20 C.F.R. §§ 404.1520(a), 416.920(a), and he must "state the weight he accords to each item of impairment evidence and the reasons for his decision to accept or reject that evidence."  Lucas v. Sullivan, 918 F.2d 1567, 1574 (11th Cir. 1990).

In this case, the ALJ gave no weight to Dr. Myers' October 2012 opinion that Plaintiff suffered, on average, one seizure per week.  The ALJ found such a report to be inconsistent with Dr. Myers' records for Plaintiff's January, February, and July 2012 visits, when Plaintiff reported no seizure activity since December 2011 (tr. 26).  Plaintiff contends that Dr. Myers' opinion is neither unsupported by her medical records nor conclusory.

As the ALJ noted, Dr. Myers' medical records for the first three times she examined Plaintiff clearly show that Plaintiff reported she was not currently experiencing seizures.  Only at her final visit, in October 2012, did Plaintiff state that she had been experiencing nocturnal seizures at least once a week for several months.  Even at that time, however, Dr. Myers did not appear to accept Plaintiff's report of weekly nocturnal seizures, noting Plaintiff's unreliability as a historian and declining to change Plaintiff's medication until further testing had been conducted to confirm the nature of the seizures.  Also, although Dr. Myers described the symptoms associated with Plaintiff's seizure disorder as including tongue bites or other injuries and loss of bladder control (tr. 583), Dr. Myers' records do not reflect that Plaintiff reported any such symptoms to her; indeed, many of Plaintiff's emergency room records specifically state that she did not experience tongue biting or incontinence during the seizures for which she presented (*see* tr. 415, 550, 568, 592).  As Dr. Myers' comments in the October 2012 Seizures Medical Source Statement that Plaintiff experienced weekly seizures, which included tongue bites or other injuries and loss of bladder control, are inconsistent

with Dr. Myers' earlier records and unsupported by any other medical evidence, including Dr. Henchey's records, the ALJ was entitled to accord the comments no weight.

Finally, as a general matter, the court is satisfied that substantial evidence supports the ALJ's conclusion that Plaintiff did not have an impairment or combination of impairments that meets or medically equals a Listed impairment.  No credible opinion from an acceptable medical source found that Plaintiff's impairments were equivalent in severity to the criteria of either Listing 11.02 or Listing 11.03.  As to Listing 11.02, Plaintiff's records are insufficient to document that—with a frequency of more than once per month in spite of at least three months of prescribed treatment—she experienced convulsive seizures with loss of consciousness during the day or nocturnal episodes manifesting residuals which interfered significantly with activity during the day.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.02.  With regard to Listing 11.03, there likewise is no detailed documentation in Plaintiff's medical records of non-convulsive seizures occurring more frequently than once a week in spite of at least three months of prescribed treatment, in which she experienced transient postictal manifestations of unconventional behavior or significant interference with activity during the day.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.03.   In fact, several of Plaintiff's emergency room records indicate that was alert and oriented upon examination in the hours after suffering a seizure (tr. 425, 550, 566).  Furthermore, Plaintiff does not point to, and the court did not locate, treatment records containing the required detailed description of a typical seizure.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.00(A).  Although the ALJ noted, and discounted, Third Party statements from persons stating they had witnessed Plaintiff having seizures (tr. 26, citing Exh. 23E), Plaintiff was required to—but did not—provide medical reports documenting that the conditions of her impairment met the Listings' specific criteria.  *See* Wilson, 284 F.3d at 1224.

VI.     CONCLUSION

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed.  42 U.S.C. § 405(g); Lewis, 125 F. 3d at 1439; Foote, 67 F.3d at 1560. Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making her findings, or that any other ground for reversal exists.

Accordingly, it is **ORDERED** that the decision of the Commissioner is **AFFIRMED**, that this action is **DISMISSED,** and that the clerk is directed to close the file.

At Pensacola, Florida this 17<u>th</u> day of June 2015.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**